## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GERALD J. PETERS, JR.,

    *Plaintiff*,

    v.

CITY OF TORRINGTON, TORRINGTON BOARD
OF PUBLIC SAFETY, WILLIAM BALDWIN, JR.,
ERIC DAIGLE and DAIGLE LAW GROUP LLC,

    *Defendants*.

No. 3:24-cv-01293-MPS

## RULING ON MOTIONS TO DISMISS

Gerald J. Peters, Jr., a police officer, brings this action against his employer, the City of Torrington ("the City"), the Torrington Board of Public Safety, and Torrington police chief William Baldwin Jr. (collectively, the "Torrington defendants"), as well as Attorney Eric Daigle and his law firm, Daigle Law Group LLC (together, the "Daigle defendants"), alleging, among other claims, that all defendants conspired to and that the Torrington defendants did deprive him of his constitutional rights under 42 U.S.C. § 1983.  The claims arise from the termination of Peters's employment as a police sergeant following a 2020 incident in which Peters used oleoresin capsicum ("OC") spray in subduing a suspect.  The Torrington defendants and the Daigle defendants have both moved to dismiss all claims against them under Rule 12(b)(6).  ECF Nos. 40, 42.  For the reasons that follow, I grant the motions to dismiss the plaintiff's claims arising under federal law and dismiss the remaining claims without prejudice to raising them in state court.

## I.     FACTUAL AND PROCEDURAL HISTORY

The following facts, which I accept as true for purposes of this ruling, are drawn from the Amended Complaint, ECF No. 33, unless otherwise noted.

### A. Background

Between 2009 and his termination in 2021, the City employed Peters as a sergeant with the Torrington Police Department. *Id.* ¶ 28. Among his duties, Peters served as an approved instructor in the use of force for his department and the Connecticut Police Officer Standards and Training Council. *Id.* ¶ 23. In 2007, he was certified as an instructor in the use of OC spray (known familiarly as pepper spray). *Id.* ¶ 24.

Among the regulations under which Torrington police officers operate, "General Order 1-11 permits the use of OC Spray against subjects who are actively resisting in a manner that, in the officer's judgement, is likely to result in injuries to themselves or others." *Id.* ¶ 33. General Order 3.01 provides: "Authorized OC spray is an alternative to physical control techniques and the use of other intermediate weapons. As with any other use of force, however, OC spray must not be used indiscriminately or without justification. Officers must be able to articulate the reason(s) the subject was sprayed with OC spray." *Id.* ¶ 34. From 2010 to 2018, Peters used OC spray on suspects more than thirteen times, including six times in the Torrington Police Department's booking area. *Id.* ¶¶ 36–37. On each occasion, Peters's use of OC spray was investigated and found to be justified and within department guidelines for use of force. *Id.* ¶¶ 40–41. Baldwin did not change these orders after he was appointed Chief of the department on December 1, 2018. *Id.* ¶¶ 30, 42.

### B. Underlying Incident

On May 23, 2020, following reports of two civil disturbances, Torrington police officers detained Christopher Spetland, an individual with an alleged history of aggressive behavior toward police, including "assaulting an officer and fighting with police and others." *Id.* ¶ 52–56. Spetland kicked at and physically resisted officers before he was handcuffed, *id.* ¶¶ 56–57, and then

threatened officers with physical violence, *id.* ¶ 58. While transporting Spetland to the police department, Officer Tyler Otis "indicated in police code that Spetland was physically resisting and noncompliant to police commands." *Id.* ¶ 60. Upon arriving at the department, Spetland said that he intended to fight with Otis. *Id.* ¶ 61.

At the department, Peters was in charge that night of the Patrol Division's Evening Shift, and his duties included oversight of the radio system, the video surveillance system, and the booking area, and responsibility for prisoner safety and security. *Id.* ¶¶ 49–51. On the video system, Peters observed while three officers moved Spetland from the police cruiser into the department. *Id.* ¶¶ 63, 67. While in transit, Spetland "attempted to strike Officer Otis with an elbow" and "successfully kicked another officer in the shin." *Id.* ¶ 64. At this point, officers held Spetland to the ground before moving him into a wheelchair for transport to the booking area. *Id.* ¶ 65. Peters met Spetland and the officers holding him in the booking area. *Id.* ¶ 68. Spetland, who was not wearing a mask amid the COVID-19 pandemic, continued to threaten officers and resist their control holds in the booking area as they prepared to place him in a holding cell. *Id.* ¶¶ 69, 72, 76.

Department regulations required officers to remove restraints from a suspect before placing him in a holding cell, a transition that would potentially give a suspect the opportunity to harm himself or the officers. *Id.* ¶¶ 70–71. As officers were preparing to transfer Spetland into a cell, Peters observed that Spetland's behavior was consistent with narcotics use, and that Spetland was likely under the influence of "a substance that augmented his anger, violence and general behavior." *Id.* ¶¶ 78–79. Based on his training and experience, Spetland's condition and behavior toward officers made it "immediately apparent" to Peters "that the use of OC Spray would be justified, necessary and the most appropriate use of force to bring Spetland under control," *id.*, and

that a regulation on assisting subordinates "imposed on him a duty to subdue Spetland through deploying OC Spray." *Id.* ¶ 81.

Peters took an OC spray dispenser from an officer and showed it to Spetland, instructing the suspect that he would be sprayed if he did not stop threatening the officers. *Id.* ¶¶ 82–83. Spetland turned to confront Peters while continuing to resist Officer Otis's control hold. *Id.* ¶¶ 84–85. Peters then "administered a short blast of OC Spray into Spetland['s] face," *id.* ¶ 85, causing "Spetland to immediately become compliant and thereafter cooperate with the booking procedure," *id.* ¶ 88. Peters then removed Spetland from the wheelchair and placed him face down on the floor, before officers moved Spetland into a holding cell. *Id.* ¶¶ 86, 89. Spetland was sent to a hospital for injuries suffered during the underlying civil disturbances; the injuries were not caused by Peters's use of OC spray or removal from the wheelchair. *Id.* ¶¶ 92–93. Sergeant John Maiga, another Torrington PD use of force instructor, wrote in a use of force report about the incident that the OC spray was justified under the department's General Orders. *Id.* ¶ 100. No complaint about the incident was filed. *Id.* ¶ 103.

### C.  Investigations and termination

Two days after the incident with Spetland, on May 25, 2020, a police officer with the Minneapolis Police Department killed George Floyd, an "incident that affected departments across the nation." *Id.* ¶¶ 101–102. Peters alleges that Baldwin was motivated to open an investigation into Peters's use of OC spray on Spetland "to protect [Baldwin's] career from the fallout of the George Floyd Tragedy." *Id.* ¶ 106. Peters also alleges that Baldwin was motivated to pursue investigations against, and subsequently terminate, Peters because Baldwin believed the "use of OC Spray was against his religion and was religiously licentiousness [sic]." Id. ¶ 267; *see also id.* ¶¶ 191–93.

On May 28, 2020, after Sergeant Maiga signed off on the use of force report, Baldwin asked Lieutenant Vincenzo Calabrese to conduct an internal affairs investigation. *Id.* ¶¶ 103, 109. Baldwin's appointment of Calabrese, who unlike Maiga was not a use of force instructor, contravened "department policy and the Collective Bargaining Agreement between the police union and the department." *Id.* ¶¶ 107. Peters, despite requesting to meet with Calabrese, was not interviewed as part of the investigation, in contravention of department policy and best practices. *Id.* ¶¶ 111, 114. Without considering Peters's testimony and despite witness statements to the contrary, Calabrese concluded that Spetland was not actively resisting officers and that Peters's use of force violated the department's General Orders. *Id.* ¶¶ 118, 120. Peters alleges that Baldwin, who supervised the investigation, knew it "violated Peters's rights." *Id.* ¶¶ 108, 110, 112–13, 119.

Baldwin referred Calabrese's findings to the State's Attorney's office and the State Police for a criminal investigation. *Id.* ¶ 123. Pending the investigation, Baldwin suspended Peters and placed him on administrative leave. *Id.* ¶ 124. After meeting with Peters and Spetland as part of its investigation, *id.* ¶ 127, the State Police determined that there was no probable cause to find that Peters's use of OC spray amounted to criminal conduct, *id.* ¶ 128. On November 13, 2020, the State's Attorney's office agreed that no probable cause existed to charge Peters. *Id.* ¶ 129. Baldwin returned Peters to full duty on November 16, 2020. *Id.* ¶ 131.

On December 24, 2020, Peters sent to Baldwin a notice of claim for falsely and wrongfully accusing him of misconduct in the Spetland incident, under Connecticut General Statutes §7-101a.[1] On January 2, 2021, Baldwin instructed the Daigle defendants to conduct an independent

---

[1] The statute reads, in part: "Each municipality shall protect and save harmless any . . . municipal employee[] of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such officer or such employee while acting in the discharge of his duties." Conn. Gen. Stat. § 7-101a(a).

investigation into whether Peters's use of force violated the department's General Orders, and whether Peters gave false statements to the State Police. ECF No. 33 ¶¶ 136, 142–43. Peters alleges that Baldwin ordered the investigation "not to effect a necessary or lawful goal of the department," but to retaliate against Peters for filing a notice of claim. *Id.* ¶ 138. Peters further alleges that the Daigle defendants knew the investigation lacked a rational basis, *id.* ¶ 140, and that during the investigation, the Daigle defendants misrepresented witness testimony and facts in attempts to get witnesses to change their testimony, *id.* ¶ 152. The Daigle defendants' report noted that Spetland was actively resisting officers when Peters used the OC spray, *id.* ¶ 146, and that Officer Otis believed use of OC spray was justified because he and other officers were in imminent danger, *id.* ¶ 147. Despite this evidence, the Daigle defendants concluded on April 7, 2021 that Peters's use of OC spray violated General Orders 3.01 and 1-11. *Id.* ¶¶ 151, 155. Peters alleges that the investigation was not independent but was instead directed by Baldwin to reach a predetermined conclusion that Peters violated the General Orders. *Id.* ¶¶ 139, 141, 154.

As a result of the Daigle defendants' report, Baldwin placed Peters on administrative leave for a second time on April 9, 2021, pending a *Loudermill* hearing on May 6, 2021. *Id.* ¶ 156. At the *Loudermill* hearing, Peters argued that the reports of both Calabrese and the Daigle defendants were flawed. *Id.* ¶ 158. Asked by Baldwin if he would use OC Spray again under similar circumstances, Peters replied, "Yes, however if you told me not to do it I would follow your order. If you gave me a better way to deal with this situation I'm always willing to learn." *Id.* ¶ 161.

On May 11, 2021, Baldwin notified Peters that his employment with the Torrington Police Department was terminated for violating the General Orders and an unwillingness to change his conduct. *Id.* ¶ 163. The termination also resulted in Baldwin "taking [Peters's] Police Officer Certification and his vested benefits, wages, medical benefits and pension." *Id.* ¶¶ 160, 165. The

next day, May 12, 2021, Baldwin hosted a news conference regarding Peters's termination and publicly released video of the Spetland incident in contravention of department General Orders not to make statements to the media about police business. *Id.* ¶¶ 166, 168, 292. Peters alleges that Baldwin's decisions to terminate Peters's employment and host the news conference were made in bad faith, and that the latter was done for the purpose of inflicting emotional distress on Peters. *Id.* ¶¶ 164, 166–68.

### D. Arbitration and litigation

After the Torrington Police Commissioner denied Peters's grievance, the police union appealed Baldwin's termination to the Connecticut Department of Labor, Board of Mediation and Arbitration. *Id.* ¶¶ 169–70. During arbitration, conducted from January to October 2022, Daigle recanted his report and "concurred that Spetland was actively resisting the control hold of Otis, which would have justified the use of OC Spray." *Id.* ¶¶ 173–74. On February 24, 2023, the arbitrators found that Peters did not violate General Orders 3.01 or 1-11 and was not terminated for just cause, and ordered him returned to full duty. *Id.* ¶ 175.

Notwithstanding the binding arbitration, on February 28, 2023, Baldwin sent an on-duty police officer to Peters's residence to deliver a letter instructing Peters not to return to the police department under penalty of trespass. *Id.* ¶¶ 176, 288.

On March 22, 2023, the City and Baldwin challenged the arbitrators' finding by filing an application in Connecticut Superior Court to vacate the arbitration award. *Id.* ¶¶ 178; ECF No. 65-1 at 9.[2] On July 18, the Superior Court granted the city's application to vacate and ordered a

---

[2] Peters has filed two notices of Connecticut state courts rulings. ECF Nos. 65, 68. I can take judicial notice of these rulings. *See Musciotto v. Nardelli*, No. 3:19-CV-559 (KAD), 2019 WL 5086691, at *2 (D. Conn. Oct. 10, 2019) ("In deciding a motion to dismiss, the Court may take judicial notice of public records such as pleadings, orders, judgments, and other documents from prior litigation, including state court cases.").

rehearing.  ECF No. 65-1 at 9.  On September 19, 2023, Peters appealed the Superior Court's decision to the Connecticut Appellate Court.  ECF No. 65-1 at 12 n.4.  Two days later, the city moved to dismiss the appeal, *id.*; Peters alleges in the complaint before me that the challenge was "patently frivolous" and lacked a good faith basis.  ECF No. 33 ¶¶ 178–82.  The Connecticut Appellate Court denied the motion to dismiss on December 13, 2023, and issued an opinion articulating its reasons on March 19, 2024.  ECF No. 65-1 at 12 n.4 (citing *Torrington* v. *Council 4, AFSCME, AFL-CIO, Local 442*, 312 A.3d 1112 (2024)).

With the appeal pending, Peters filed this action in state court on July 23, 2024.  ECF No. 1 at 1.  On August 6, 2024, the Torrington defendants removed the case to this court, and the case was assigned to me.  *Id.*  Peters filed the operative amended complaint on October 5, 2024, ECF No. 33.  The Torrington defendants and Daigle defendants filed separate motions to dismiss in November 2024.  ECF Nos. 40, 42.  After the motions were fully briefed, the Appellate Court ruled in Peters's favor, reversing the Superior Court's decision granting the City's motion to vacate and remanding for further proceedings.  ECF Nos. 65 at 1, 65-1 at 3.  After the Connecticut Supreme Court denied further review, the Superior Court confirmed the arbitration award by agreement of the parties on July 16, 2025.  ECF No. 68 at 3.

### E.  Claims

Peters's amended complaint brings sixteen counts, all of which the defendants have moved to dismiss.  In his opposition brief, Peters concedes that some claims or portions of claims may be dismissed, including all claims against the Torrington Board of Public Safety.  ECF No. 50-1 at 1–3.  He also agrees with the Defendants that claims against Baldwin in his official capacity are duplicative of claims against the City.  *Id.*  Thus, as an initial matter, I dismiss all claims against the Torrington Board of Public Safety and all claims against Baldwin in his official capacity.

8

Peters brings the following claims:

(1) against the Torrington defendants,

    (a) deprivation of liberty and property, equal protection, and procedural due process under the First and Eighth Amendments via 42 U.S.C. § 1983;[3]

    (b) deprivation of speech and religious rights under the federal and Connecticut constitutions under Conn. Gen. Stat. § 31-51q;[4]

    (c) intentional infliction of emotional distress;

    (d) false light invasion of privacy;

    (e) abuse of process; and

    (f) vexatious litigation, under common law and Conn. Gen. Stat. § 52-568;

(2) against all defendants, civil conspiracy to commit each of the above; and

(3) against the Daigle defendants,

    (a) breach of fiduciary duty;

    (b) negligence; and

    (c) tortious interference with a contractual relationship.

---

[3] Peters concedes that he has not stated a Fifth Amendment takings clause claim. ECF No. 50-1 at 2. He also concedes that any equal protection claim under the Fourteenth Amendment is coextensive with his claims under the First Amendment, and that any substantive due process claims are duplicative of his procedural due process claims. *Id.* at 2–3 (indicating that he "had no intention of claiming substantive due process claims aside from those enumerated rights incorporated through the Fourteenth Amendment"). Finally, Peters acknowledges that his federal procedural due process claims fail and requests to replead them as state-law claims pursuant to Connecticut's constitution. ECF No. 50-1 at 2–3. Thus, any federal claim arising under the Fifth or Fourteenth Amendments is dismissed. I will not address his request regarding a state-law claim.

[4] Peters concedes that all claims under § 31-51q apply only to the City, not Baldwin. *Id.* at 3.

## II.    **LEGAL STANDARD**

To avoid dismissal under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I accept as true all of the complaint's factual allegations when evaluating a motion to dismiss, *Id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

## III.    **DISCUSSION**

### A.    **Counts One and Two: Claims under 42 U.S.C. § 1983**

#### 1.    **Statute of limitations**

The defendants move to dismiss Peters's claims under § 1983 because they are untimely. Peters does not contest that his claims under § 1983 are subject to a three-year limitation,[5] and he does not contest that the defendants may press a statute of limitations defense in their Rule 12(b)(6)

---

[5] *See* Conn. Gen. Stat. §§ 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."). Connecticut law supplies the statute of limitations for Peters's federal causes of action because § 1983 contains no explicit statute of limitations. *See Lounsbury v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994). "Courts in this district generally subject § 1983 claims to the three-year limitation period provided by Connecticut General Statutes § 52-577, which pertains to general tort claims not specifically covered by different limitations provisions." *Santana v. Quiros*, No. 3:21-CV-376 (SVN), 2022 WL 16706959, at *5 (D. Conn. Nov. 4, 2022).

motion.[6]  Rather, Peters alleges that the entirety of his complaint—including the internal affairs

and Daigle investigations, his termination, and the subsequent arbitration proceedings and

litigation—represents a "continuing course of conduct," which he argues should toll the statute of

limitations.  *See* ECF No. 33 ¶¶ 138, 235; ECF No. 50-1 at 3–5.  For the Torrington defendants, he

contends, this conduct continued up to and beyond the date the complaint was filed, July 23, 2024.

*See* ECF No. 50-1 at 3–5.  For the Daigle defendants, he asserts, the alleged conduct includes

Daigle's testimony at an arbitration hearing on July 25, 2022.  *See* ECF No. 58 at 2–4.

Although state law determines the statute of limitations for a Section 1983 claim, federal

law governs when the statute of limitations begins to run.  *Barnes v. City of New York*, 68 F.4th

123, 127 (2d Cir. 2023); *Reed v. Goertz*, 598 U.S. 230, 235 (2023).  "The crucial time for accrual

purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages

may be recovered in a civil action."  *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir.

1980).  Nonetheless, the Second Circuit recognizes that the ordinary trigger of the statute of

limitations may be extended under the "continuing violation" doctrine—not, as Peters asserts, the

"continuing course of conduct" doctrine, which is a state-law concept.  *See Gonzalez v. Hasty*, 802

F.3d 212, 220 (2d Cir. 2015) ("The continuing violation doctrine, where applicable, provides an

exception to the normal knew-or-should-have-known accrual date" applicable to *Bivens* claims

(internal quotation marks omitted)); *see also Cornwell v. Robinson*, 23 F. 3d 694, 703 (2d Cir.

1994) (same rule applies to Section 1983 claims).

For Peters's federal claims, "a defendant's acts make up a continuing violation only if they

---

[6] "While a statute of limitations defense is most often pleaded as an affirmative defense . . . a
defendant may raise the statute of limitations in a Rule 12(b)(6) motion '[w]here the dates in a
complaint show that an action is barred by a statute of limitations . . . .'"  *Chisholm v. United of
Omaha Life Ins. Co.*, 514 F. Supp. 2d 318, 324 (D. Conn. 2007) (quoting *Ghartey v. St. John's
Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989)).

'collectively constitute one unlawful practice.'" *Vasel v. Garrahy*, No. 3:19-CV-1241 (JAM), 2022 WL 313882, at *3 (D. Conn. Feb. 2, 2022) (quoting *Gonzalez*, 802 F.3d at 220). "The continuing violation doctrine . . . applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that *by their nature* accrue only after the plaintiff has been subjected to some threshold amount of mistreatment."   *Gonzalez*, 802 F.3d at 220 (emphasis added).

> The continuing violation doctrine typically arises in the context of unlawful workplace discrimination challenged under Title VII . . . .  '[I]f a Title VII plaintiff files an [Equal Employment Opportunity Commission] charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.'

*Id.*  (quoting *Chin v. Port Auth. of N.Y. & N.J.,* 685 F.3d 135, 155–56 (2d Cir. 2012)).  "[W]here the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable . . . claim." *Id.*

Peters's claims against the Torrington defendants relate to a series of discrete events, not "one unlawful practice."  Peters alleges that the Torrington defendants deprived him of his rights, or conspired to do so, by: (1) opening and conducting an internal affairs investigation in 2020, (2) opening and overseeing the Daigle investigation in 2021, (3) terminating Peters in 2021, (4) hosting the news conference in 2021, and (5) failing to abide by the arbitrator's findings in 2023 and beyond.  ECF No. 33 ¶ 253.  While the first three events might constitute one unlawful practice, culminating in the termination, the Defendants had engaged "in enough activity to make out an actionable . . . claim" once Peters was terminated.  *Gonzalez*, 802 F.3d at 220.  By that point, Peters was "aware that he [was] suffering from a wrong" for which he could sue.  *Singleton*, 632 F.2d at 192.  The news conference and the 2023 conduct are discrete acts that occurred after the claim became actionable.  Peters alleges that these events are connected to the investigations and

termination because in all actions the Defendants shared the same "goal[,] . . . motivation and objective." ECF No. 33 ¶ 138. But a common motive is insufficient to transform discrete events into a continuing violation. *See Vasel*, 2022 WL 313882, at *3 ("The acts that Vasel challenges are discrete. Their only connection is that they all had the same allegedly illegal motive. Therefore, the acts are at best 'serial,' not 'continuing' violations.").

Peters also alleges that the Daigle defendants engaged in a conspiracy with the Torrington defendants to deprive him of his constitutional rights, and that their conduct formed a continuing violation. As part of the alleged conspiracy, the Daigle defendants investigated the Spetland incident and issued a report that the Torrington defendants used as a basis to terminate Peters. ECF No. 33 ¶ 257–58. The investigation and issuance of the report occurred from January to May 2021, and Peters was terminated May 11, 2021; and so Daigle's actions likewise fall outside the limitations period because, again, Peters had an actionable claim once he was terminated. The only conduct of the Daigle defendants that falls within the limitations period is Daigle's 2022 testimony before the arbitration board, during which he allegedly gave contradictory answers and recanted his report. *Id.* ¶¶ 174, 329. But again, the 2022 testimony represents a discrete event.

This is true even in the context of a civil conspiracy that, as here, is alleged to continue into the statute of limitations period. *Harrison v. New York*, 95 F. Supp. 3d 293, 327 (E.D.N.Y. 2015) ("[F]or claims alleging civil conspiracies, including conspiracies to violate an individual's civil rights, the cause of action accrues and the statute of limitations begins to run from the time of commission of the overt act alleged to have caused damages." (internal quotations omitted)); *see also Singleton*, 632 F.2d at 192 ("Characterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as 'a single series of interlocking events' does not postpone accrual of claims based on individual wrongful acts.").

For these reasons, there is no continuing violation that would toll the statute of limitations of Peters's federal claims against any defendant. Peters's federal claims stemming from events that occurred before July 24, 2021, are therefore time-barred and dismissed.

### 2. Timely Section 1983 claims

All that is left to decide on the Section 1983 claims, then, is whether Peters plausibly alleges a cause of action for events occurring since July 24, 2021. I find that he does not.

To state a claim for relief under Section 1983, the plaintiff must allege facts showing that the defendant deprived him of a constitutionally protected right while the defendant was acting under color of state law. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982); *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986). To prevail on a claim against a municipality, the plaintiff must also prove "that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). As noted above, Peters brings Section 1983 claims against the City and against Baldwin in his individual capacity for violations of his rights under the First Amendment free speech and establishment clauses, the Eighth Amendment, and procedural due process under the Fourteenth Amendment, as well as claims against all defendants for civil conspiracy to violate those same rights.

Peters alleges that the following adverse acts occurred within the statute of limitations period: (1) Daigle provided contradictory testimony and recanted his report during arbitration proceedings in 2022, ECF No. 33 ¶¶ 174, 329; (2) notwithstanding the arbitration panel's decision in favor of Peters, Baldwin sent a letter in January 2023 instructing Peters not to return to the police department, *id.* ¶ 176; and (3) the Torrington defendants acted in bad faith when defending the decision to terminate Peters before the arbitration panel and later when it challenged the panel's decision in state court, *id.* ¶¶ 178–82. For the most part, Peters does not expressly identify which

right these specific actions violated; rather, he alleges that they are part of the entire course of conduct which collectively violated the First, Eighth, and Fourteenth Amendments.

        a.  <u>Daigle's testimony</u>

First, to the extent Peters brings a civil conspiracy claim based on Daigle's arbitration testimony, which was allegedly favorable to Peters, the claim fails for lack of injury. *Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir. 1993) ("[T]o collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff . . . [must have an] actual injury."). Peters does not attribute any constitutional injury to Daigle's contradictory testimony, once that act is separated from the time-barred allegations regarding Daigle's investigation and report. Nor could he, because the arbitrators found in Peters's favor, and the Superior Court recently confirmed the arbitration award. ECF No. 68 at 3. Thus, Peters has not alleged Daigle's testimony caused him any harm. Without injury, the civil conspiracy claim fails. *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ("To prove a § 1983 conspiracy, a plaintiff must show . . . an overt act done in furtherance of [a] goal [to inflict an unconstitutional injury] causing damages."). In any event, Peters advances no theory under which Daigle's testimony could have violated Peters's rights under the First, Eighth, or Fourteenth Amendments.[7]

        b.  <u>Baldwin's 2023 letter to Peters</u>

Next, Peters fails to plausibly allege that Baldwin's 2023 letter instructing Peters not to return to the police department deprived him of his First Amendment rights. Peters's claims that "this letter and determination by Baldwin was not made with a lawful proper purpose, but in

---

[7] The Eighth Amendment claim is frivolous. Peters cites no authority applying the Excessive Fines Clause to the ordinary economic consequences of loss of employment. I will not discuss the Eighth Amendment claim further.

furtherance of the improper ends" alleged in the complaint.[8]  ECF No. 33 ¶ 177.  Peters seems to

suggest that the instruction for him not to return to the police department property was a refusal

by the Torrington defendants to comply with the arbitration panel's order that "Peters be returned

to full duty," ECF No. 33 at 175, in retaliation for Peters's December 24, 2020 Notice of Claim.

But this is not plausible in light of the fact that the Notice of Claim preceded the letter by over two

years.  *See Milardo v. Town of Westbrook*, 120 F. Supp. 3d 206, 221–22. (D. Conn. 2015) ("A First

Amendment retaliation claim fails absent some causal connection between protected speech and

adverse action. . . . A plaintiff may establish the requisite causal relationship . . . by showing close

temporal proximity between the protected speech and the adverse employment action. . . . The

point at which a temporal relationship becomes too attenuated to support a causal inference . . . is

a question of months, not years.").  In contrast, a police officer delivered the letter to Peters four

days after the arbitrators' order.  Only three weeks later, the Torrington defendants moved to vacate

the arbitration award.  ECF No. 65-1 at 9.  Given this timeline, the notion that Baldwin sent the

instruction for Peters not to return to the department to retaliate against Peters for exercising his

First Amendment rights, rather than because the City planned to appeal the arbitration decision, is

not plausible.[9]  And once the appeal process was finally completed, the arbitration award was

confirmed "by agreement of the parties."  ECF No. 68 at 3.  Peters thus has not plausibly alleged

that he suffered a constitutional violation as a result of the 2023 instruction that he not return to

the department.[10]

---

[8] These alleged improper ends include retaliation for filing a notice of claim (free speech) and
promotion of Baldwin's personal religious views (establishment clause).  *See* ECF No. 33 ¶ 138.
[9] As explained in the next section, the decision to appeal the arbitration itself does not support a
claim for a constitutional violation.
[10] Any claim that Baldwin sent the letter in furtherance of promoting religious ideology in violation
of the Establishment Clause is implausible because the timing of the letter clearly advances and
was close in time with the motion to vacate the arbitration award.  Further, Peters does not cite any

c.  Subsequent arbitration and litigation

Finally, Peters contends that the Torrington defendants violated his rights within the limitations period through "abuses of administrative and judicial processes and sham litigation" before the arbitration panel and in state court.  ECF No. 50-1 at 4; *see also* ECF No. 33 ¶¶ 156–83, 253(m).  These claims fail to plausibly allege a deprivation of a constitutional right.  As for the arbitration, Peters alleged that pursuant to the Union Bargaining Agreement, "the City and [the police] Union would agree to have the determination of whether the termination or discipline was appropriate or proper by turning it over for binding arbitration and the decision of the Connecticut State Board of Mediation and Arbitration would be final and binding upon both parties."  ECF No. 33 ¶ 246.  Because the City was obligated to bring the termination before the arbitrators once Peters filed a grievance, this action could not have violated Peters's rights.

Peters also alleges that the Torrington defendants then breached the Union Bargaining Agreement "by failing to accept the binding arbitration decision as it relates to [] returning Peters to full employment," *id.* ¶ 253(m), i.e., by filing an application in Connecticut Superior Court to vacate the arbitration award.  The argument that any such breach violates Peters's constitutional rights, however, fails because it does not recognize that the Torrington defendants exercised their own constitutional rights in appealing the arbitration award.  *See Lynch v. Ackley*, 811 F.3d 569, 580 (2d Cir. 2016) (As part of his First Amendment retaliation claim, "[police officer] Lynch alleges that [Chief of Police] Ackley encouraged an investigative reporter to seek out and publish derogatory information about Lynch . . . .  This allegedly retaliatory conduct, however, consisted of Ackley's exercise of her own core First Amendment rights . . . to defend herself against Lynch's

---

authority that the Establishment Clause somehow limits Baldwin's ability to preserve the City's appeal rights.

attacks.  It is hard to see why in this context Ackley has any less entitlement to First Amendment protection than Lynch.").

The only exception that would permit Peters's claim of a First Amendment violation would be if the appeal or subsequent litigation was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–62 (1993) (defining "sham litigation" as "the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief").  Peters fails to plausibly allege that the appeal or litigation was objectively baseless.  The Superior Court found in favor of vacating the award, which indicates that the City's decision to move to vacate was, at least, based on probable cause.  The appellate court's ruling, although it overturned the Superior Court's ultimate findings, does not indicate that the motion to vacate was frivolous or otherwise without legal merit.  *See* ECF No. 65-1 at 23 (Appellate Court noting that "[r]easonable minds may well differ about the merits of [the arbitration panel's] determination" that Peters's conduct complied with general orders of the police department).  Because the litigation of the arbitration award was not objectively baseless,[11] Peters fails to state a claim that the litigation deprived him of any constitutional right.[12]

---

[11] This includes the City's subsequent motion to dismiss Peters's appeal of the Superior Court's decision.  Although Peters alleges the motion was "patently frivolous," ECF No. 33 ¶¶ 179–82, the Appellate Court's ruling denying the motion, of which I may take judicial notice, made no such indication.  *Torrington* v. *Council 4, AFSCME, AFL-CIO, Local 442*, 312 A.3d 1112, 113 (2024) (noting that issue of finality presented by motion to dismiss was "a matter of first impression").  In any event, Peters suffered no injury from the City's filing of that motion.

[12] To the extent Peters alleges that the Torrington defendants violated the Establishment Clause in pursuing litigation, he cites no authority applying the Establishment Clause in even remotely similar circumstances.  In any event, even if it was Baldwin, rather than the City, who moved to vacate the arbitration award, and even if he was motivated by his religious views to do so, he would still be asserting his First Amendment rights in doing so because the litigation was not objectively baseless.

Peters's allegations of the defendants' conduct during the statute of limitations period fail to state a claim of action under Section 1983. Counts One and Two are therefore dismissed.

## B. <u>Count Three and Four: Claims under Conn. Gen. Stat. § 31-51q</u>

Peters also brings claims under Connecticut General Statute § 31-51q, which provides a cause of action against "any employer . . . who subjects or threatens to subject any employee to discipline or discharge on account of [] the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution . . . ." Peters's Section 31-51q claims raise a substantial federal question because they necessarily turn on the construction of federal law. *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 113 (2d Cir. 2004). Although I have dismissed all of Peters's federal causes of action, I will also address his Section 31-51q claims because federal courts have original jurisdiction over cases "arising under" federal law. 28 U.S.C. § 1331.

Peters's Section 31-51q claims are subject to the same statute of limitations as his Section 1983 claims—Connecticut General Statute § 52-577, which provides for a three-year limitations period. *Arciuolo v. Tomtec, Inc.*, No. CV166066564S, 2018 WL 915048, at *5 (Conn. Super. Ct. Jan. 19, 2018). Unlike the Section 1983 claims, for Section 31-51q I must apply state law to decide when the cause of action accrues. The standards to toll the statute of limitations because of a "continuing course of conduct" under Connecticut state law are as follows:

> To support a finding of a continuing course of conduct . . . there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where [the Connecticut Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of *either* a special relationship between the parties giving rise to such a continuing duty *or* some later wrongful conduct of a defendant related to the prior act."

*Essex Ins. Co. v. William Kramer & Assocs., LLC*, 205 A.3d 534, 541 (Conn. 2019). But the

continuing course of conduct doctrine does not apply unless there is "both an initial wrong and a subsequent continuing duty that are distinct" from each other. *Medical Device Solutions, LLC* v. *Aferzon*, 264 A.3d 130, 166 (Conn. App. 2021), *cert. denied*, 264 A.3d 94 (Conn. 2021).

Peters does not identify any legal duty the defendants owed him following his termination.[13]  But even assuming that the defendants had a continuing legal duty not to violate Peters's First Amendment rights, a breach of that duty is not distinct—it *is* the "initial wrong." *See id.*; ECF No. 50-1 at 4 (Peters arguing that his allegations represent "numerous specific acts over a long span of time that deprive him of his federal constitutional rights to inflict the same kind of harm").  As with the continuing violation doctrine, "repeated and distinct violations . . . are not what is contemplated by the definition of a continuing course of conduct." *Id.*  Rather, it is "applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where . . . it is appropriate to allow the course of [action] to terminate before allowing the repose section of the [limitation period] to run." *Essex Ins. Co.*, 205 A.3d at 540–41; *see also Blanchette v. Barrett*, 640 A.2d 74, 85 (Conn. 1994), *overruled on other grounds by Grey v. Stamford Health Sys., Inc.*, 924 A.2d 831 (Conn. 2007) ("The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied.").

As noted in the Section 1983 section above, this is not a case in which the defendant's alleged acts causing injury are impossible to pinpoint.  Nor is it a case where filing earlier would

---

[13] Peters also does not allege that he had a "special relationship" with any defendant that gave rise to a duty that continued after his termination.  A "special relationship" is usually "one that is built upon a fiduciary or otherwise confidential foundation." *Essex Ins. Co.*, 205 A.3d at 542.  Peters alleges the Daigle defendants owed him a fiduciary duty during their investigation and in submitting a report, but he does not allege this duty continued to exist after these acts.

have been premature.  The City terminated Peters's employment—depriving him of his salary and benefits—on May 11, 2021.  As of that moment, there was no "ongoing relationship."

It is true that when Peters filed his complaint, his termination could "yet be remedied" (and, it appears, largely has been remedied) through the union grievance and arbitration and subsequent litigation processes.  But Peters points to no authority, and I am not aware of any prior cases, in which a court has tolled the statute of limitations for a Section 31-51q claim because of the potential for a future remedy in a parallel proceeding.  Further, even if the existence of a potential remedy could toll the limitations period, it would not do so here.  I see no reason why a plaintiff who was terminated from his employment would need to wait to file a Section 31-51q claim for damages because arbitration (or a subsequent appeal) to restore his employment was ongoing.  The statute makes an employer liable for "subject[ing] or threaten[ing] to subject any employee to discipline or discharge on account of" the employee's exercise of his First Amendment rights.  Conn. Gen. Stat. § 31-51q(b).  On its face, the statute includes no exhaustion requirement or any other impediment to suing once the employee has been discharged, and the parties have not cited, and I have not found, any Connecticut decisions applying an exhaustion requirement to claims under Section 31-51q.  Peters could have pursued these claims concurrently with the arbitration process, and in fact *did* file this action before the appeal of the arbitration award concluded.

For these reasons, the Section 31-51q claims are not tolled under the continuing course of conduct doctrine.  And as noted above, the alleged conduct within the limitations period starting July 24, 2021 does not plausibly support claims of a constitutional violation.  Counts Three and Four are therefore dismissed.

### C.  Other claims

As I have dismissed all claims over which I have original jurisdiction, I decline to exercise

supplemental jurisdiction over Peters's other state-law claims, pursuant to 28 U.S.C. § 1367(c)(3). Therefore, the claims in Counts Five through Sixteen against the City, Baldwin in his personal capacity, and the Daigle defendants are dismissed without prejudice.

## IV.  **CONCLUSION**

For the foregoing reasons, the Motions to Dismiss are GRANTED as to Counts One, Two, Three and Four, and as to all counts against the Torrington Board of Public Safety and Baldwin in his official capacity.  All other claims are dismissed without prejudice.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
      August 5, 2025